```
        IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF ALABAMA
                 SOUTHERN DIVISION

MICHAEL W. CIPRIANO,          *
                              *
     Plaintiff,               *     CIVIL ACTION NO. 14-00384-B
                              *
vs.                           *
                              *
CAROLYN W. COLVIN,            *
Commissioner of Social Security,*
                              *
     Defendant.               *
```

## ORDER

Plaintiff Michael W. Cipriano (hereinafter "Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq*. On June 17, 2015, the parties waived oral argument and consented to have the undersigned conduct any and all proceedings in this case. (Docs. 16, 17). Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings not inconsistent with this

decision.[1]

## I.   <u>Procedural History</u>

Plaintiff filed applications for a period of disability and disability insurance benefits on September 2, 2010.[2]  (Tr. 96). Plaintiff alleged that he has been disabled since January 15, 2010, due to "bipolar, anxiety, and lower back." (Id. at 107, 110).  Plaintiff's applications were denied, and upon timely request, he was granted an administrative hearing before Administrative Law Judge Larry J. Butler (hereinafter "ALJ") on September 18, 2012.  (Id. at 32).  Plaintiff attended the hearing with his counsel and provided testimony related to his claims.[3]  (Id.).  On May 10, 2013, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled.  (Id. at 20). The Appeals Council denied Plaintiff's request for review on July 2, 2014.  (Id. at 1).  Thus, the ALJ's decision dated May

---

[1] Any appeal taken from this decision shall be made to the Eleventh Circuit Court of Appeals.  (See Doc. 19)("An appeal from a judgment entered by a magistrate judge shall be taken directly to the United States court of appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court.").

[2] Plaintiff testified at his administrative hearing that he previously received disability benefits, but he lost the benefits because he made too much money at his part-time job at a mental health support center.  (Tr. 40).

[3] Because the ALJ concluded at step two of the disability evaluation process that Plaintiff was not disabled, no testimony was taken from a vocational expert.

10, 2013 became the final decision of the Commissioner.

Having exhausted his administrative remedies, Plaintiff timely filed the present civil action. (Doc. 1). The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.  Issue on Appeal

  A.  **Whether the ALJ erred in finding Plaintiff's bipolar disorder non-severe at step two of the sequential evaluation process?**

## III. Factual Background

Plaintiff was born on September 27, 1966, and was forty-five years of age at the time of his administrative hearing on September 18, 2012. (Tr. 32, 96). Plaintiff testified that he quit school in the eighth grade and that he passed parts of the GED but did not attempt all parts of the test.[4] (Id. at 37, 54).

Plaintiff testified, and the record shows, that he last worked part-time from 2002 to 2010 as a co-manager at a mental health support center but was fired when he stopped showing up for work. (Id. at 38-42, 111, 126). Prior to that, Plaintiff

---

[4] The record shows that Plaintiff made good grades in school but dropped out of school in the eighth grade. (Tr. 311).

3

worked as a truck driver.[5]   (Id. at 42-43, 111).   Plaintiff testified that he can no longer work because of his bipolar disorder which causes repeated periods of time when he is severely depressed, anxious, sleepless, and unable to leave his home.[6]  (Id. at 42-43).

Plaintiff testified that he lives with his girlfriend and his girlfriend's two children.   (Id. at 55).   In his Function Report, Plaintiff stated that, depending on how he feels, he may sleep all day, go for a walk, play the guitar, go to the store, or watch television.   (Id. at 137).   According to Plaintiff, he has periods of sleeplessness for days on end and then, periods where he is at the other extreme, and will stay in the bed sleeping for days.   (Id. at 138).   At times, he does not attend to his personal needs and does no cooking.   (Id.).   At other times, he can prepare meals, do housework and yard work, and take care of himself.   (Id. at 139).   He drives, shops, goes out alone, and goes to the drop-in mental health center when he can.  (Id. at 140-41).   He has no problems getting along with family

---

[5] Plaintiff testified that he has attempted volunteer work with a children's charity and some part time work in the stucco business, but he found the work too stressful and began to miss work.  (Tr. 44, 48-49).

[6] Plaintiff testified that he has physical problems as well, including problems with his back and arthritis in his shoulder, but these conditions do not prevent him from working.  (Tr. 53).

or others.   (Id. at 142).   He can pay attention and follow instructions when he is feeling well, but he does not handle stress well.  (Id.).

Plaintiff testified that he has seen many psychiatrists. (Id. at 45).  He has taken medication for bipolar disorder since he was eighteen years old, and the medications sometimes stop working and sometimes have side effects.   (Id. at 46).   He has attempted suicide several times, and he has had bouts of cutting himself.  (Id. at 46-47).

## IV.  Analysis

### A.   Standard of Review

In reviewing claims brought under the Act, this Court's role is a limited one.   The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[7]   Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).   A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.   Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).   The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.   Brown v.

---

[7] This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler*,* 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

### B.   Discussion

An individual who applies for Social Security disability benefits must prove his or her disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for

6

determining if a claimant has proven his disability.[8]  20 C.F.R. §§ 404.1520, 416.920.

In the case *sub judice*, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since January 15, 2010, the alleged onset date, and that he has the "medically determinable" impairments of bipolar, anxiety, and low back pain.[9]  (Id. at 22).  The ALJ further determined that while

---

[8] The claimant must first prove that he or she has not engaged in substantial gainful activity.  The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments.  If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work.  Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history.  Id.  Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history.  Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled.  Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999).  See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

[9] Plaintiff does not take issue with the ALJ's findings related to his physical impairment of low back pain.  Rather, Plaintiff

Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, his statements concerning the intensity, persistence and limiting effects of the alleged symptoms were not entirely credible. (Id. at 26).

The ALJ concluded that while Plaintiff has the "medically determinable" impairments of bipolar, anxiety, and low back pain, he "does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months." (Id. at 22). Therefore, he "does not have a severe impairment or combination of impairments" and is not disabled.[10] (Id. at 22, 27).

In assessing the severity of Plaintiff's impairments, the ALJ made the following relevant findings:

> **4. The claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments (20 CFR 404.1521 et seq.).**

---

challenges only the ALJ's finding that his bipolar disorder is non-severe. (Doc. 12 at 1). Therefore, the Court's discussion is limited to that issue.

[10] Having found that Plaintiff's impairments were non-severe, the ALJ did not proceed beyond the second step of the sequential evaluation process.

Basic work activities are the abilities and aptitudes necessary to do most jobs. Examples of these include:

1. Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

2. Capacities for seeing, hearing, and speaking;

3. Understanding, carrying out, and remembering simple instructions;

4. Use of judgment;

5. Responding appropriately to supervision, co-workers, and usual work situations; and

6. Dealing with changes in a routine work setting (SSR-85-28).

In reaching the conclusion that the claimant does not have an impairment or combination of impairments that significantly limits his ability to perform basic work activities, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic

9

techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

The claimant was 43 years of age as of the alleged onset date. He has low back pain and occasional spasms (Exhibit 4F/2). The claimant smokes 2 packs of cigarettes a day (Exhibits 4F/1 and 11F/1). He lives with his girlfriend; he has two children, ages 15 and 16, who live with their mother. He is 73 inches tall and weighs approximately 220 pounds. He has a very poor work history. He testified that he has never applied for or received unemployment. He has an 8th grade education. He received disability insurance benefits from February 21, 1994 through January 31, 2004; which resulted in an overpayment of $20,614. He testified that the police tased him on March 19, 2009 after a "suicide" attempt; and he stayed overnight in the hospital. He has a history of bipolar disorder; however he is not taking any medication (Exhibit 11F/4). The undersigned notes the claimant appeared fine at the hearing.

The undersigned accepts the treatment records. The treatment notes confirm that

the claimant has a history of bipolar disorder. The treatment notes from Physicians Regional Medical Center, dated March 16, 2009 - March 18, 2009 show the claimant was brought to the emergency room by law enforcement after he was tasered at home. Reportedly, the claimant slashed his wrists. The claimant stated he had been under a lot of personal stress for approximately 1-2 weeks. The claimant had been noncompliant with some of his psychotropic medication. The claimant consumes large quantities of alcohol even though he stated that he knows that it makes him more depressed. The hospital records show that his "hospitalization was relatively uneventful" (Exhibit 1F).

. . .

The mental health treatment notes from Naples Psychiatric show the claimant received regular treatment from 2008-2011. The claimant was diagnosed with bipolar disorder. In 2008, the claimant reported "I'm feeling really good, exercising, sleeping 6-7 hours which is good." The most recent treatment note, dated March 21, 2011, shows the claimant stated his application for SSDI was denied and he is worried about his finances. His mood was stable; he was alert and oriented; he denied suicidal or homicidal ideation or plan; however he claimed he had some suicidal thoughts but he would not act on the thoughts. The treatment notes consistently state that the claimant drinks alcohol regularly. It was indicated that the claimant should be seen again in 3 months. There are no treatment records that show the claimant was seen after March 21, 2011 (Exhibits 7F and 13F). The undersigned accepts the treatment notes and finds that the claimant has been diagnosed with bipolar disorder; but there is no evidence to substantiate a finding that it has more than a minimal effect on

11

the claimant's ability to perform basic work
activities.

The treatment notes from Neuropsychiatric
Associates of Southwest Florida, P. A. are
from 1998-1999. The claimant stated he was
diagnosed with Bipolar Disorder at the age
of eighteen (Exhibit 16F). The claimant
received counseling at Catholic Charities of
Collier County on and off beginning August
25, 2008. He was diagnosed with bipolar
disorder I disorder, and anxiety disorder
NOS. He missed appointments and has been
known to self-medicate with alcohol at
times. He was Baker Acted by the police in
April of 2009 (Exhibit 18F). The most
recent treatment notes indicate he was last
seen on November 16, 2010. The claimant has
chosen to stop taking medication and seeing
his ARNP. The treatment notes the claimant
has not been hospitalized and has better
control of his anger and his cutting
behavior (Exhibit 19F).

The medical records and reports from the
David Lawrence Center show the claimant has
recorded services from August 29, 2007-
August 9, 2012 (Exhibits 12F and 15F). The
treatment notes dated March 19, 2009 shows
the claimant was recommended for evaluation
by psychiatrist for a potential Baker Act
lift. It was indicated that the claimant
was currently receiving services at Catholic
Charities. The claimant reported a total of
8 voluntary hospitalizations since he was
18 and previous Baker Act approximately 7-8
years prior. The claimant admitted to
periods of time when he was not active with
services. The claimant stated that he drank
12 beers 3 days prior to the evaluation.
The claimant was ultimately discharged from
services and episode of care due to no
contact. . . .

Eshan M. Kibria, D.O. completed a
consultative evaluation of the claimant on

12

January 19, 2011 (Exhibit 4F). The claimant's chief complaint was occasional spasm low back not related to accident and injury; bipolar diagnosed at age 18, ok with medication; and anxiety. The claimant admitted he drinks approximately 6 alcoholic beverages per week and smokes a pack of cigarettes per day. Upon examination, Dr. Kibria observed the claimant appeared comfortable sitting; and his personality was pleasant and cooperative. The claimant was noted to be very pleasant. Work related mental activities, understanding, memory, concentration, social interaction and adaptation were intact. The claimant was oriented to time, place and person. . . .

Cheryl Kasprzak, Psy.D. completed a consultative evaluation of the claimant on January 18, 2011 (Exhibit 3F). The claimant reported that he is unable to work because he has anxiety daily, has had panic attacks since age 22, was diagnosed with bipolar at age 18; and he experiences depression. He stated his duration of inability to work began January 2010. The claimant reported that on a typical day he gets up between 9 AM and 1PM, goes to bed between 12 and 6AM and has had this pattern his entire life. He is able to shower, dress and shave daily unassisted. He drives a vehicle four times weekly and last drove a vehicle to shoot pool with friends. He is able to cook for and feed himself simple meals, cleans the bathroom once weekly, and takes out the trash. He is able to wash dishes by hand or in the dishwasher and is able to sweep, mop and vacuum floors, however does not do these chores. He watches 8 hours of television daily, reads self-help books twice monthly, makes five home-cooked meals weekly and plays the guitar and shoots pool.

LaWanna Harvey a state agency medical consultant completed a Case Analysis on February 4, 2011 (Exhibit 5F). Theodore

13

Weber M.Div., Psy.D., completed a case analysis on April 19, 2011 (Exhibit 8F). Bettye Stanley, D.O. completed a case analysis on April 25, 2011 (Exhibit 9F). Alicia Maki, Ph.D., a state agency psychological consultant, completed a Psychiatric Review Technique from on February 4, 2011 (Exhibit 6F). All of the state agency medical and psychological consultants consistently found that the claimant's back problems and mental health impairments are nonsevere.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

The state agency medical consultants recognized that the claimant has medically determinable impairments. However, they denied the claim because they found that the claimant's bipolar disorder, anxiety, and low back pain were nonsevere. They concluded that a review of the medical evidence revealed no severe limitations resulting from the claimant's condition that would limit his ability to work (Exhibits 3B, 4B, 7B, 5F, 6F, 8F, 9F). State agency medical and psychological consultant's findings of fact must be treated as expert opinion evidence at the administrative law judge review level. SSR 96-6p, 61 Fed. Reg. 34467 (July 2, 1996). The state consultant's opinion is found persuasive.

The conclusion that the claimant does not have a physical impairment or combination of physical impairments that significantly limits his ability to perform basic work activities is supported by the record as a

whole.

Because the claimant has medically determinable mental impairments, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.

For the reasons stated above, the undersigned finds that the medical evidence of record supports a finding that the claimant has no limitation in activities of daily living; only mild limitation in social functioning; only mild limitation in concentration, persistence or pace; and the claimant has experienced no episodes of decompensation which have been of extended duration. Therefore, since the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere (20 CFR 404.1520a(d)(1)).

In sum, the claimant's physical and mental impairments, considered singly and in combination, do not significantly limit the claimant's ability to perform basic work activities. Thus, the claimant does not have a severe impairment or combination of impairments.

(Id. at 22-26).

The Court now considers the foregoing in light of the record in this case and the issue on appeal.

**Issue**

**Whether the ALJ erred in finding Plaintiff's bipolar disorder non-severe at step two of the sequential evaluation process?**

Plaintiff argues that the ALJ erred in finding that his bipolar disorder is "non-severe." (Doc. 12 at 2). Specifically, Plaintiff argues that the substantial record evidence shows that his bipolar disorder is more than a "slight abnormality" and that it has more than a "minimal" effect on his ability to do basic work activities. Thus, Plaintiff argues, under SSR 96-3p, it is a "severe" impairment, and the ALJ erred in finding to the contrary. (Id.). The Commissioner counters that the ALJ's finding that Plaintiff's bipolar disorder is non-severe is supported by the opinions of the State Agency reviewers and the consultants in this case. (Doc. 13 at 4-14). Having reviewed the record at length, the Court finds that the ALJ erred in finding Plaintiff's bipolar disorder non-severe.

In this case, the ALJ found at step two of the sequential evaluation process that Plaintiff had the "medically determinable" impairments of bipolar, anxiety, and low back pain, and determined that they were not "severe" impairments; thus, he ended the inquiry. (Tr. 22). The Court notes at the outset that "[s]tep two is a threshold inquiry", and at this stage, "only claims based on the most trivial impairments are

16

rejected". McDaniel v. Bowen, 800 F. 2d 1026, 1031 (llth Cir. 1986).    At step two, the ALJ must determine whether the claimant's impairments, alone or in combination, "significantly limit" the claimant's "physical or mental ability to do basic work skills".   Wind v. Barnhart, 133 Fed. Appx. 684, 690 (llth Cir. 2005 (quoting Phillips v. Barnhart, 357 F. 3d 1232, 1237 (11th Cir. 2004)).   "An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." McDaniel, 800 F.2d at 1031.   However, a diagnosis is insufficient; instead, the claimant has the burden of showing the effect of the impairment on his ability to work.   Wind, 133 Fed. Appx. at 690; see also Marra v. Colvin, 2013 U.S. Dist. LEXIS 105669, *13-14, 2013 WL 3901655, *5 (M.D. Fla. 2013) ("It is [the] Plaintiff's burden to prove the existence of a severe impairment, and [he or] she must do that by showing an impact on [his or] her ability to work.").

If an ALJ erroneously finds an impairment to be non-severe at step two of the sequential evaluation process, the error is not fatal if the ALJ finds at least one of Plaintiff's impairments to be severe and continues through the sequential evaluation process and considers the combined effect of all the

claimant's impairments at the later steps. See Ferguson v. Astrue, 2012 U.S. Dist. LEXIS 139135, *25, 2012 WL 4738857, *9 (N.D. Ala. 2012)(Because step two only acts as a filter to prevent non-severe impairments from disability consideration, the ALJ's failure to find an impairment severe at step two is not reversible error where the ALJ finds at least one impairment severe and at the later steps considers the combined effect of all of the claimant's impairments); Delia v. Commissioner of Soc. Sec., 433 Fed. Appx. 885 (llth Cir. 2011)(Substantial evidence did not support the ALJ's finding, at step two, that the claimant's mental impairments were not severe; however, because the ALJ deemed several of the claimant's other medical impairments to be severe and therefore continued on in the sequential inquiry through steps three, four, and five, the error at step two was harmless and was not cause for reversal). As noted supra, in this case, the ALJ did not find that any of Plaintiff's impairments were severe; thus, he did not proceed beyond step two of the evaluation process. Because the ALJ's finding that Plaintiff's bipolar disorder is non-severe is not supported by substantial evidence, and the evaluation was concluded at step two, the decision must be reversed as the error was not harmless.

     In this case, Plaintiff produced overwhelming evidence

18

that established not only a diagnosis of bipolar disorder but also a history of extensive treatment for significant symptoms related to that disorder. Indeed, the record evidence reflects that as early as 1985, when Plaintiff was eighteen years old, he was diagnosed with bipolar disorder after experiencing symptoms of mental illness and attempting to commit suicide by slashing his wrists.[11] (Tr. 307, 319, 339). To date, Plaintiff has required significant mental health treatment, including two involuntary psychiatric hospitalizations, eight voluntary psychiatric hospitalizations, and decades of ongoing out-patient therapy and psychotropic medication treatment. (Id. at 249).

For example, the record shows that in 1988, at the age of twenty-two, Plaintiff began outpatient mental health treatment at the David Lawrence Center for bipolar disorder. (Id. at 310). Also, in 1990, Plaintiff began treatment with Dr. Robert Wald, M.D., for manic depressive illness and was treated with Lithium Carbonate and Imipramine. (Id. at 298). In 1991, Plaintiff's condition deteriorated, and he was hospitalized twice in the psychiatric unit of Charter Glades Hospital. (Id. at 298, 310).

---

[11] Plaintiff's family history includes a father, grandfather, aunt, and two cousins with manic depressive illness/bipolar disorder and histories of suicide attempts. (Tr. 285, 307, 320).

In 1992, Plaintiff continued outpatient treatment for bipolar disorder and alcohol abuse at the David Lawrence Center where he reported suicidal feelings, sporatic mood shifts, depression, mind racing, anxiety, and confusion. (Id. at 310, 313-12). In December 1993, Plaintiff was hospitalized in the psychiatric unit of Naples Community Hospital for bipolar illness after being unable to go to work or get out of bed for weeks.[12] (Id. at 282-83, 285). Plaintiff reported erratic moods and feeling angry and self-destructive. (Id. at 287). He was treated with Lithium Carbonate, Clonopin, and Restoril and discharged after approximately two weeks with instructions to continue his outpatient therapy. (Id. at 285, 287).

In January 1994, results of MMPI testing revealed that Plaintiff was "quite disturbed," "confused and disorganized," "experiencing intense anxiety," and unable to make even routine decisions. (Id. at 288). In March 1994, Plaintiff was again admitted to the psychiatric unit of Naples Community Hospital, where he was treated for bipolar disorder and alcoholism. (Id. at 292, 299). Plaintiff's records reflect that, at that time, he had been hospitalized four times for psychiatric care. (Id. at 293). Plaintiff's wife reported that his condition was

---

[12] At that time, Plaintiff had been working as a chemical technician. (Tr. 283).

deteriorating, that he was unable to get out of bed, that he was experiencing increased sleeping, anger, suicidal ideation, and a return to drug and alcohol use, that he was confused, that he was finding it increasingly difficult to do things without someone helping him, that he was pacing and walking in circles, and that he was unable to make decisions regarding his activities of daily living. (Id. at 292-93). Dr. James Collins, M.D., noted that Plaintiff was "socially withdrawn, irritable, generally dysphoric and nonfunctional as regards work and his relationships with others." (Id. at 290).

In September 1997, at the age of thirty-one, Plaintiff was again admitted to the psychiatric unit at Naples Community Hospital where he was treated for manic symptoms. Upon discharge, he was placed on Depakote and continued outpatient treatment at the David Lawrence Center. (Id. at 313-15). Plaintiff's treatment notes in December 1997 reflect that he was receiving disability benefits at that time. (Id. at 315).

In 1998, at the age of thirty-one, Plaintiff began treatment with Dr. Frederick Schaerf, M.D., Ph.D.[13] (Id. at

---

[13] Dr. Schaerf noted that Plaintiff had recently been evaluated at the National Institute of Mental Health, where he had remained for six weeks. (Tr. 319). According to Dr. Schaerf, he was being evaluated for "transcranial magnetic stimulation and/or psychiatric medications in conjunction with investigative drug trials," but Plaintiff became hypomanic and left. (Id.).

319).  Plaintiff's wife reported that during the winter months,
Plaintiff became "semi-catatonic, where she [was] unable to get
him out of bed, and he remain[ed] in bed actually not even
performing basic elimination in the bathroom during these severe
depressive times."  (Id.).  These episodes were followed by
periods of racing nocturnal thoughts, nightmares, sleeplessness,
and suicidal fantasies.  (Id. at 319-20).  A therapist working
with Dr. Schaerf observed that Plaintiff had a strong sense of
hopelessness.  (Id. at 323).  Dr. Schaerf's records document
that, at that time, Plaintiff had approximately six inpatient
hospitalizations, two inpatient drug rehab treatments, and two
suicide attempts.  (Id. at 320).  Dr. Schaerf likewise noted
that Plaintiff was on psychiatric disability.  (Id. at 321).

In 1999, at the age of thirty-three, Plaintiff continued to
receive weekly outpatient treatment and medication treatment
with Dr. Schaerf for bipolar disorder and alcoholism in
remission.  Plaintiff experienced some improvement on
medications and was "getting back to doing some productive work"
but then reported problems with sleeplessness, mind racing, fear
of people, and fear of leaving the house.  (Id. at 324-29, 332).
By March 1999, Plaintiff was again experiencing problems with
hyperactivity, depression, anger, and hopelessness.  (Id. at
335-36).

22

On June 7, 2001, at age thirty-four, Plaintiff was examined
at the request of the Agency by a consultative psychologist, Dr.
Russell Masterson, Ph.D.   (Id. at 338).   Dr. Masterson noted
that Plaintiff had a DUI in the previous year and a half but had
gotten his driving privileges restored.   (Id.).   Dr. Masterson
also noted that Plaintiff worked out, sometimes running
compulsively for fifteen to twenty miles in one exercise
session.   (Id.).   Plaintiff reported that he was sleep deprived
and frequently manic and then depressed.   (Id.).   Plaintiff
reported that his last job was in 2000 when he worked at a
church as a janitor, and before that he worked for brief periods
of time surveying and landscaping.   (Id. at 339-40).   Plaintiff
reported that in the preceding eight months, he had experienced
periods of manic depressive symptoms, confusion, and being
catatonic and unable to leave the house.   (Id. at 340).   Dr.
Masterson diagnosed "rule out/rule in bipolar disorder without
ongoing psychosis versus possible schizoaffective type of
illness with anger management personality problems and
alcohol/drugs."   (Id.).   Dr. Masterson assigned a GAF score of
50 to 55, noting "moderate to serious symptoms that seem to
impair his relationships and his difficulties in controlling
anger and at times his alcohol and substance abuse."[14]   (Id. at

_____

[14] GAF (Global Assessment of Functioning) is a numeric scale (0

341).   Dr. Masterson opined that Plaintiff's prognosis was "poor" because he has "built defenses against medications and he does not follow through on rehabilitation programs or psychiatric treatment plans." (Id.).

From 2000 to 2007, Plaintiff continued to receive outpatient treatment for bipolar disorder at the David Lawrence Center. [15]   (Id. at 194, 258-59).   In 2003, Plaintiff was involuntarily hospitalized under the "Baker Act" for two weeks for cutting.   (Id. at 194, 249).   In 2007, Plaintiff was discharged from outpatient treatment at the David Lawrence Center due to "no contact." (Id. at 258-59).

From 2008 to 2012, Plaintiff received outpatient treatment

---

through 100) used by mental health clinicians that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum.   A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or serious social dysfunction (e.g., no friends, unable to keep a job).   A GAF score of 51-60 suggests moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). A GAF score of 61-70 is indicative of mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.   See http://www.gafscore.com.

[15] From 2002 through January 2010, Plaintiff worked part time at a mental health support center, the Sarah Ann Drop In Center, as a finance manager and supervisor of three other employees.   (Tr. 193).

from Pamela Collett, ARNP, BC, at Healthy Minds.  (Id. at 227, 346).  When Plaintiff began treatment with Ms. Collett on April 2, 2008, he was forty-one years of age and reported that he was having trouble with sleeplessness, anxiety, depression, confusion, and feelings of suicide.  (Id. at 227, 229).  Plaintiff stated that he had lost his disability benefits because he "made too much money" at his part-time job at the Sarah Ann Drop In Center.  (Id. at 227).  Ms. Collett diagnosed Plaintiff with "Bipolar II" and assigned a GAF score of 65, indicating only mild symptoms at that time.  She prescribed medications and instructed Plaintiff to return in three weeks. (Id. at 229-30).

In March 2009, at the age of forty-two, Plaintiff was involuntarily hospitalized at Naples Community Hospital again under the "Baker Act" for suicidal ideation and for "actively cutting himself."[16]  (Id. at 249).  The record shows that police officers tazed Plaintiff because he had a knife to his stomach and then transported him to the hospital for treatment of his wounds.  (Id.).  Plaintiff reported that he was feeling overwhelmed.  (Id.).  His records document that, at that time,

---

[16] Plaintiff's records show this was the second time he had been involuntarily hospitalized under the Baker Act.  (Tr. 249). Plaintiff stated that he cut himself to "let pain and pressure out."  (Id. at 256).

he had at least eight previous hospitalizations for psychiatric care. (Id.). It was also noted that Plaintiff was receiving out-patient psychiatric care at Catholic Charities and working part time at the Sarah Ann Drop in Center as a "co-manager," where he had worked for the previous seven years.[17] (Id. at 250, 252). Plaintiff reported that he enjoyed helping others immensely and was looking forward to being discharged and getting back to work. (Id.). Dr. Daniel Deutschman examined Plaintiff and assigned him a GAF of 45, indicating serious symptoms. (Id. at 257). Upon discharge, Dr. Deutschman instructed Plaintiff to follow up with outpatient treatment at Healthy Minds with Pam Collett, ARNP, and at Catholic Charities, with Debra Hoefling, L.C.S.W. (Id. at 260, 344).

On October 12, 2009, Plaintiff's treatment records from Pam Collett, ARNP, reflect that Plaintiff was "coming out of a bad depression," accompanied by suicidal feelings and "alot" of drinking. (Id. at 226). In November 2009, Plaintiff was doing better and reported that "work [was] good." (Id. at 225). However, on December 22, 2009, Plaintiff reported that he was "up and down" and "cycling." (Id. at 224).

Sometime between January and March 2010, Plaintiff was

---

[17] Plaintiff reported that he took a break one time to procure a full time job, but it did not work out, and he returned to his part-time job at the Sara Ann Drop In Center. (Tr. 252).

terminated from his part-time position at the Sarah Ann Drop In Center for "missing a significant amount of time at work."[18] (Id. at 193, 343).  Following his termination of employment, Plaintiff continued out-patient treatment with Pamela Collett, ARNP.  Plaintiff's treatment records from March 3, 2010, reflect that Plaintiff had stopped going to work in mid-January, that the cops had been sent to his house to check on him, and that he had been fired.  (Id. at 222-23).  Plaintiff reported worsening symptoms, feeling confused, depressed, and as if his life was in chaos.  (Id. at 223).  He admitted to substance abuse and non-compliance with his medication.  (Id.).  A report from Debra Hoefling, L.C.S.W., documents that, in March 2010, Plaintiff "was struggling with depression and anxiety – was withdrawn and not coping well with daily activities." (Id. at 343).  "He also cycled into an accelerated activity level, avoided contacting his boss and became distracted in other directions."[19]   (Id.).

---

[18]  This event coincides with Plaintiff's alleged onset date, January 15, 2010.  (Tr. 107).

[19]  The report states that "[Plaintiff] has made attempts at increasing exercise, eating well, and trying to stay positive to improve his mental health.  However, he continues to lapse into mood swings, medication non-compliance, resulting in withdrawal from friends and family and/or an increase in interpersonal conflicts, and disruption of his sleep. . . . Besides his struggle to maintain employment [Plaintiff] also struggles to function well in relationships[.]  [This] adds to his emotional distress. . . .  Since [Plaintiff] has been out of work and volunteering a small amount each week, he has not reported

On March 24, 2010, Plaintiff reported black out periods, not sleeping, and not going out of the house for the previous week. (Id. at 221).   In April 2010, Plaintiff reported fewer dissociative periods and improvement in his sleep.  (Id. at 220).  In June 2010, Plaintiff reported that he was sleeping better but also having some periods of hypomania.  (Id. at 218). In September 2010, Plaintiff reported that he was doing alright, with some ups and downs.  He was volunteering at an equestrian center for children but was experiencing a lot of anxiety and sleeplessness.  (Id. at 216).  Plaintiff reported that two days the previous week he could not get out of the house and that he was forcing himself to get up and shower.  (Id.).  In December 2010, Plaintiff reported that he was not sleeping, that he was having mixed states of up and down, that he was still volunteering at the equestrian center, but his concentration was poor, and he was experiencing distractibility and anger. (Id. at 217).

In 2011, Plaintiff continued psychotherapy with Debra Hoefling, L.C.S.W, at Catholic Charities for depression.  (Id. at 194).  He also continued outpatient therapy with Pamela Collett, ARNP, at Healthy Minds.  (Id. at 231).  Plaintiff's

suicidal ideation, cut on himself, or been hospitalized.  He was last Baker Acted by the police in April 2009."   (Tr. 343-44).

records reflect that he was not sleeping well, but his mood had stabilized for the most part, and he was alert, oriented, clean, and neat. (Id.). He reported some suicidal thoughts but stated that he would not act on them.[20] (Id.).

The record contains a report dated September 6, 2012, from Ms. Hoefling, L.C.S.W, Plaintiff's therapist at Catholic Charities, in which she states that she had been treating Plaintiff since 2008 and that he "continues to struggle with moods related to bipolar disorder and anxiety" and that "[l]ack of motivation, depressive symptoms, and anxiety including social withdrawal hinder his day to day functioning." (Id. at 346). She continued, "[s]ome positive aspects since last report are [Plaintiff] has not been hospitalized and has better control of his anger . . . also his cutting behavior. He attends therapy sessions on and off and participates while here -- working on problem-solving and/or dialectical skills and/or cognitive processing at each visit. . . . [Plaintiff] has not worked or volunteered in the community and is reluctant to do either for fear that episodes will prevent reliable follow through." (Id. at 346-47). Ms. Hoefling concluded her report with an observation that the lengthy disability process had taken a toll

---

[20] Plaintiff reported that he ceased treatment with Ms. Collett in 2012 because he could no longer afford it. (Tr. 346).

on Plaintiff's mental health and that his anxiety, erratic sleep, depressive symptoms, social withdrawal, and hopelessness were increasing.   (Id. at 347).   This is the final treatment note in the record.

Remarkably, despite the extensive medical evidence set forth above related to Plaintiff's psychiatric treatment for bipolar disorder, both before and after the alleged onset date of January 15, 2010, the ALJ concluded that Plaintiff's bipolar disorder was non-severe, that is, that it amounted to a "trivial" impairment that had no more than a "slight" effect on his ability to work.   The ALJ appears to have relied on the opinions and findings of two State Agency reviewers, Dr. Alicia Maki, Ph.D., and Dr. Theodore Weber, Psy.D., and two consultative examiners, Dr. Cheryl J. Kasprzak, Psy.D., and Dr. Eshan M. Kibria, M.S., M.B.A., D.O.  Having reviewed the medical evidence in this case at length, the Court finds that the ALJ's reliance on the expert opinions and findings referenced in his decision is misplaced.

Weighing the opinions and findings of treating, examining, and non-examining physicians is an important part of the disability determination process.   In reaching a decision, the ALJ must specify the weight given to different medical opinions and the reasons for doing so.   See Winschel v. Commissioner of

Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011).  The failure to do so is reversible error.  See Williams v. Astrue, 2009 U.S. Dist. LEXIS 12010, *4, 2009 WL 413541, *1 (M.D. Fla. 2009).

When weighing the opinions of a treating physician, the ALJ must give the opinions "substantial weight," unless good cause exists for not doing so.  Costigan v. Commissioner, Soc. Sec. Admin., 2015 U.S. App. LEXIS 2827, *10, 2015 WL 795089, *4 (11th Cir. Feb. 26, 2015) (citing Crawford v. Commissioner of Soc. Sec., 363 F.3d 1155, 1160 (11th Cir. 2004) and Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985)).  The opinion of "a one-time examining physician — or psychologist," on the other hand, is not entitled to the same deference as a treating physician, Petty v. Astrue, 2010 U.S. Dist. LEXIS 24516, *50, 2010 WL 989605, *14 (N.D. Fla. Feb. 18, 2010) (citing Crawford, 363 F.3d at 1160), and an ALJ must have good cause to credit an examining consulting physician's opinion over that of a treating physician.  See Adamo v. Commissioner of Soc. Sec., 365 F. Appx. 209, 213 (11th Cir. 2010).  Furthermore, absent good cause, the opinion of a non-examining physician is entitled to little weight if it is contrary to either the treating or examining physician's findings.  See Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988); Broughton v. Heckler, 776 F.2d at 962.

In addition, good cause exists to discredit the testimony

of any medical source when it is contrary to or unsupported by the evidence of record.  Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004).  "Good cause may also exist where a doctor's opinions are merely conclusory, inconsistent with the doctor's medical records, or unsupported by objective medical evidence."  Hogan v. Astrue, 2012 U.S. Dist. LEXIS 108512, *8, 2012 WL 3155570, *3 (M.D. Ala. 2012).  The ALJ is "free to reject the opinion of any physician [treating, examining, or non-examining] when the evidence supports a contrary conclusion."  Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (citation omitted); Adamo, 365 Fed. Appx. at 212 (The ALJ may reject any medical opinion if the evidence supports a contrary finding.).

The record shows that Plaintiff was examined on January 18, 2011, at the request of the Agency, by psychologist, Dr. Cheryl J. Kasprzak, Psy.D.  (Id. at 192).  Dr. Kasprzak's records indicate that Plaintiff drove himself to the appointment and that he was well groomed, cooperative, and pleasant.  (Id.). Plaintiff reported that he felt that he could not work because of his anxiety and depression, which he rated as a seven or eight on a ten-point scale, and because of panic attacks which rendered him unable to leave the house on a weekly basis.  (Id. at 193-94).  Dr. Kasprzak's examination findings reflected that

Plaintiff's attitude was cooperative, and his thought process, attention, and concentration were normal.  However, his mood was dysphoric, and his affect was flat.  (Id. at 194-95).  Dr. Kasprzak diagnosed Plaintiff with bipolar disorder, panic disorder with agoraphobia, and alcohol abuse and assigned him a GAF score of 53, indicating "moderate" symptoms.  (Id. at 195). Based on her examination on that date, Dr. Kasprzak opined that Plaintiff's prognosis was "fair for gainful employment."  (Id.).

The following day, on January 19, 2011, at the request of the Agency, Plaintiff was examined by a neurologist, Dr. Eshan M. Kibria, M.S., M.B.A., D.O.  (Id. at 196).  In addition to his physical findings, Dr. Kibria noted that Plaintiff's work related mental activities, understanding, memory, concentration, social interaction, and adaptation were "intact," that he was oriented to time, place, and person, that historical events were related in a coherent manner, that he had a normal fund of information, and that he had a normal speech pattern.  (Id. at 197).  Dr. Kibria rendered no other opinions or findings related to Plaintiff's mental status or ability to work.  Having reviewed the record at length, the Court finds that the opinions and findings of Dr. Kasprzak and Dr. Kibria relied upon by the ALJ are inconsistent with the treatment records and opinions of Plaintiff's treating physicians detailed above, and, thus, the

ALJ erred in relying on those opinions and findings.

Next, the record shows that in February and April 2011, State Agency reviewers, Dr. Alicia Maki, Ph.D., and Dr. Theodore Weber, Psy.D., reviewed a portion of Plaintiff's medical records[21] and concluded, based thereon, that Plaintiff's bipolar disorder was "non-severe." (Id. at 202, 214, 232). The State Agency reviewers opined that Plaintiff had no degree of limitation in activities of daily living, maintaining concentration, persistence or pace, no episodes of decompensation, and no more than "mild" difficulties in maintaining social functioning. (Id. at 212, 232). The Government concedes that the reviewers' opinions were rendered "before all the medical evidence was received" but argues that the evidence they did not review is either duplicative or insignificant. (Doc. 13 at 9-10). Yet, the Government concedes that the reviewers did not have the benefit of the two reports from Debra Hoefling, L.C.S.W, dated November 16, 2010, and September 6, 2012, documenting Plaintiff's multiple psychiatric hospitalizations, his "struggle to maintain employment," his problems with "day to day functioning," and his problems with increasing anxiety, sleeplessness, depression, social

---

[21] It appears that Exhibits 10F-19F were submitted *after* the State Agency reviewers completed their review. (Tr. 202, 232, 234-347).

withdrawal, and sense of hopelessness. (Id.; Tr. 343-47). In any event, regardless of which records the State Agency reviewers considered, their opinions are inconsistent with the substantial medical evidence in this case, as detailed above.

Given the plethora of medical evidence in this case (all of which the ALJ found credible) showing that Plaintiff received decades of psychiatric treatment for virtually constant, debilitating symptoms of bipolar disorder (including multiple suicide attempts, multiple instances of cutting himself with knives, severe depression, and cycles of mania followed by inability to wake and get out of bed), as well as evidence of a long history of problems maintaining even part-time employment and evidence that Plaintiff was previously awarded disability benefits for bipolar disorder, the ALJ's conclusion that Plaintiff's bipolar disorder is "non-severe," meaning that it is a "trivial", "slight abnormality" that has no significant effect on his ability to do basic work activities, is not supported by substantial evidence and must be reversed.

## V.    Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for a

period of disability and disability insurance benefits be **REVERSED AND REMANDED** due to the lack of substantial evidence to support the ALJ's finding that Plaintiff's bipolar disorder is non-severe.

　　　　**DONE** this **24th** day of **September, 2015.**

　　　　　　　　　　　　　　　　　**/s/ SONJA F. BIVINS**
　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**